UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61315-CIV-COHN/SELTZER

HOSTWAY SERVICES, INC.,

     Plaintiff,

vs.

HWAY FTL ACQUISITION CORP.
and BROADBANDONE, INC.,

     Defendants.
_____/

HWAY FTL ACQUISITION CORP.
and BROADBANDONE, INC.,

     Counter Plaintiffs,

vs.

HOSTWAY SERVICES, INC.,

     Counter Defendant.

_____/

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendants'/Counter Plaintiffs' Motion for

Partial Summary Judgment on Complaint [DE 61] and Defendants'/Counter Plaintiffs'

Motion for Partial Summary Judgment on Counterclaim [DE 62] (collectively, "Motions").

The Court has carefully reviewed the Motions for Summary Judgment, all of the parties'

submissions, and is otherwise advised in the premises.

For the reasons set forth below, the Court will grant the Motions.

## I. BACKGROUND

Plaintiff Hostway Services, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.  Plaintiff provides web-hosting and related services to customers.  Defendant Broadbandone, Inc. ("Broadband") is a Florida corporation with its principal place of business in Boca Raton, Florida.  Defendant HWAY FTL Acquisition Corp. is also a Florida corporation with its principal place of business in Boca Raton, Florida and is a wholly-owned subsidiary of Defendant Broadband.

Prior to April 30, 2009, Plaintiff maintained a data center and co-location facility ("the Facility") where the Plaintiff kept numerous servers on which it hosts websites for its customers ("the Servers").  On April 30, 2009, Plaintiff and Defendants entered into an Asset Purchase Agreement ("APA") whereby Defendants purchased from Plaintiff the assets Plaintiff "utilized in connection with the co-location facility," including contracts with customers.  DE 1 ¶ 6 ("Complaint").  The purchase price of the assets was $528,333.34.  The APA specified that Defendants would pay $320,000 at closing. Defendants would pay the remaining $208,333.34 in ten equal monthly payments of $20,833.33, with the first payment due a month after closing.

On April 30, 2009, the parties also entered into a co-location service agreement and an amendment to that service agreement whereby Defendants would provide Plaintiff with specified co-location services subsequent to closing ("Service Agreement").  The Service Agreement provided a means by which Plaintiff could continue to maintain its Servers at the Facility.  The initial term of the Service Agreement was for a period of five months, commencing May 1, 2009, and terminating September 30, 2009.  The Service Agreement also provided for automatic renewal for

2

successive one-month terms unless either party provided the other with written notice of intent not to renew at least thirty days prior to expiration.

In July of 2009, Defendants ceased making monthly payments under the APA. Defendants argue that they stopped making payments because Plaintiff breached representations and warranties in the APA regarding contracts Plaintiff had with its customers.  Specifically, Defendant learned that "two of the largest customers that [Plaintiff] sold to Defendants were in default and had been since before the closing on the APA."  DE 6 at 10.  Consequently, Defendants sent a letter to Plaintiff informing it of the problem and making a claim for indemnification under the APA.  Defendants also denied Plaintiff's employees access to the Facility pursuant to section 6.4 of the Service Agreement  because unauthorized personnel had been entering and allegedly damaging the Facility.[1]

Plaintiff, however, maintains that at all times it has "fully and completely performed all of its obligations under the APA."  Complaint ¶ 19.  Therefore, on August 25, 2009, Plaintiff filed its Complaint in this action.  The Complaint alleges five counts:

---

[1]Section 6.4 of the Service Agreement states the following:

**6.4 Access.** HOST will provide Customer with 24 hour per day, 7 day per week secured access to the Space for the authorized personnel listed in the SO.  Customer may add or remove personnel from the authorized list by providing not less than 48 hours' written notice of any such personnel change to HOST. Only those individuals listed on the SO will be granted access to the data center.  HOST may suspend the right of any authorized personnel or other persons to visit the HOST premises and/or the data center at any time in its reasonable discretion.

DE 3-3 at 2 ("Access Provision").

Breach of the APA ("Count I"); Injunctive Relief ("Count II"); Breach of the Service

Agreement ("Count III"); Tortious Interference with Contract ("Count IV"); and

Conversion ("Count V").  Count I of the Complaint is based on Defendants "failure to

pay [Plaintiff] the amounts due and owing under the APA."  Id. ¶ 17.  Count II of the

Complaint alleges that Defendants breached the Service Agreement by wrongfully

denying Plaintiff access to the Facility, "thereby depriving [Plaintiff] of possession of and

access to its servers, and therefore, preventing [Plaintiff] from servicing the servers and

ensuring continued and uninterrupted web-hosting services to its web-hosting

customers."   Id. ¶ 21.  Count III is also predicated on Defendants' failure to provide

Plaintiff with 24 hour per day, 7 day per week secured access to the Facility.  Count IV

alleges that Defendants tortiously interfered with contracts between Plaintiff and its

customers by preventing Plaintiff from providing services to Plaintiff's customers.

Count V alleges that Defendants have wrongfully assumed control, dominion, or

ownership over the Servers.

Plaintiff filed its Verified *Ex Parte* Emergency Motion for Preliminary Injunction

concurrently with its Complaint.  The Motion for Preliminary Injunction sought immediate

injunctive relief, but the Federal Rules of Civil Procedure provide no mechanism by

which a Court may issue a preliminary injunction without notice to the adverse party.

See Fed. R. Civ. P. 65.  Accordingly, the Court construed the Motion for Preliminary

Injunction as seeking both a temporary restraining order and a preliminary injunction.

See DE 5.

The Court found that Plaintiff's verified complaint clearly showed immediate and

irreparable damage would occur to the Plaintiff if the Court waited until the adverse

4

party could be heard in opposition.  The Court also found that Plaintiff's attorney certified in writing the efforts he made to give notice and the reasons why it should not be required.  Consequently, the Court entered a Temporary Restraining Order [DE 5] ("TRO").  The TRO required "Defendants HWAY FTL Acquisition Corp. and Defendant Broadbandone, Inc. [to] provide Plaintiff Hostway Services, Inc. with 24 hour per day, 7 day per week secured access to the data center and co-location facility on the first floor of the building located at 3250 West Commercial Boulevard in Ft. Lauderdale, Florida as contemplated in Section 6.4 of the parties' Service Agreement."  DE 5.

Thereafter, Defendants filed a Motion to Dissolve or Modify Order Granting Verified *Ex Parte* Emergency Motion for Temporary Restraining Order [DE 6] ("Motion to Dissolve").  In the Motion to Dissolve, Defendants alleged that Plaintiff used the TRO as a license to send unauthorized personnel to break into the Facility and damage property.  The Court then amended the TRO.  See DE 11 ("Amended TRO").

The Amended TRO required Plaintiff to send Defendants a list of not more than twenty individuals who would be deemed "Authorized Personnel" for purposes of entering the Facility.  The Amended TRO also contained the following terms: (1) Authorized Personnel shall have 24 hour per day, 7 day per week secured access to the data center; (2) only Authorized Personnel shall have access to the data center; (3) Defendants shall not suspend the right of Authorized Personnel to visit the Facility; (4) Authorized Personnel shall exercise due care to avoid damaging Defendant's property; and (5) no property shall be removed from the premises or the data center.

On September 3, 2009, the Court entered an Agreed Preliminary Injunction [DE 18].  Thereafter, Defendants filed their Amended Answer, Affirmative Defenses, and

5

Amended Counterclaim [DE 36].  The Amended Counterclaim asserts three counts:
(1) Breach of the APA, (2) Trespass to Personal Property, and (3) Breach of the
Services Agreement.  Defendants have moved for summary judgment on Counts II-V of
Plaintiff's Complaint.  Defendants also have moved for summary judgment on Count I of
their Amended Counterclaim.

II. DISCUSSION

**A. Legal Standard**

The Court may grant summary judgment "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue as to
any material fact and that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the
district court of the basis for its motion, and identifying those portions of [the record]
which it believes demonstrate the absence of a genuine issue of material fact."  Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must
point out to the Court that there is an absence of evidence to support the non-moving
party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production
shifts and the non-moving party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of Fed. R. Civ.
P. 56(e), the non-moving party "may not rely merely on allegations or denials in its own
pleading," but instead must come forward with "specific facts showing a genuine issue
for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

At the summary judgment stage, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In making this determination, the Court must decide which issues are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

### B. Motion for Partial Summary Judgment on Complaint

#### 1. Plaintiff's Claim of Breach of Service Agreement (Counts II and III)[2]

In Counts II and III of the Complaint, Plaintiff seeks injunctive relief and damages for Broadband's alleged breach of the Service Agreement.  In Count II, Plaintiff seeks permanent injunctive relief enjoining Broadband from "restricting, preventing or impeding in any way [Plaintiff's] access to the facility that is the subject of the Service Agreement and to [Plaintiff's] servers that reside inside that facility."  Complaint at 7.  To support its claim for injunctive relief, Plaintiff alleges that Defendants breached the Service Agreement by "wrongfully" denying Plaintiff access to the Facility.  Id. ¶ 21. Similarly, in Count III, Plaintiff alleges that Broadband's failure to provide Plaintiff with "24 hour per day, 7 day per week secured access" to the subject facility and its servers constitutes a material breach of the Service Agreement and gives rise to a claim for damages.  Id. ¶ 38.

---

[2]     Count II purports to be a claim for injunctive relief.  "Injunctive relief," however, is a remedy, not a cause of action.  The Court, therefore, construes both Count II and Count III as a claim for breach of the Service Agreement.

Defendants maintain that they never wrongfully denied Plaintiff access to the Facility.  As noted above, the parties' relationship was governed by a Service Agreement.  The Service Agreement provided that Defendants would provide access to the Facility only to Plaintiff's authorized personnel.  See Access Provision, supra note 1; DE 61-1 at 59.  Authorized personnel were individuals listed on a "Service Order."  See Access Provision, supra note 1.  Plaintiff had the right to add or remove personnel from the Service Order by providing written notice to Defendants.  See id.

Here, Defendants submit that Lucas Roh was the only authorized personnel listed on the Service Order and that they never denied Lucas Roh access to the Facility. See DE 61 at 4.  Thus, Defendants argue, they never wrongfully denied Plaintiff access to the Facility.  Plaintiff does not contend that Defendant ever prevented *authorized personnel* from entering the Facility.  Indeed, Plaintiff concedes that none of its employees were listed on the Service Order.  See DE 67 at 2.

Nonetheless, Plaintiff argues that Defendant "wrongfully" prevented Plaintiff from accessing the Facility.  Plaintiff asserts that "[a]t the time of the signing of the Service Agreement and Service Order Form[,] Broadband did not inform [Plaintiff] that it also needed to fill out a 'Colocation Authorized Access List' listing its authorized personnel who would have access to the Hostway servers."  Id.  Plaintiff further asserts that Defendants "never interfered with or objected to [Plaintiff's] employee's 24/7 access to its servers until Broadband's CEO, Jeffrey Davis, suddenly and unilaterally, refused Hostway employees at [the Facility] access to Hostway's servers on August 24, 2009." Id. at 2-3.

Essentially, Plaintiff asks the Court to find that Plaintiff does not have to comply

8

with the Access Provision in the Service Agreement.  Plaintiff provides two reasons for the relief it seeks: (1) Defendants did not tell Plaintiff about Plaintiff's obligation to put authorized personnel on a list even though that obligation is stated clearly in the Service Agreement; and (2) Defendants allowed unauthorized personnel to enter the Facility prior to August 24, 2009, so Defendants should always have to provide access to unauthorized personnel.  The Court finds Plaintiff's reasons unpersuasive.

The Service Agreement provides that it "will be governed by and construed pursuant to the laws of the State of Florida."  DE 3-2 at 6.  Under Florida law, to prevail in a breach of contract action, a plaintiff must prove the following three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.  Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006); see also Knowles v. C.I.T. Corp., 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977) ("It is elementary that in order to recover on a claim for breach of contract the burden is upon the claimant to prove by a preponderance of the evidence the existence of a contract, a breach thereof and damages flowing from the breach.").  Here, the parties do not contest the validity of the Service Agreement.

Accordingly, the Court turns to the issue of breach.  As set forth above, the Access Provision requires Defendants to provide only Plaintiff's *authorized personnel* with access to the Facility.  Authorized personnel were those individuals on a list. Plaintiff could change the list with forty-eight hours' notice.  Plaintiff, however, never prepared the list.  Because Plaintiff never prepared the list, the employees that Defendants barred from entering the Facility were *unauthorized* personnel.  Stated differently, Defendants clearly did not breach the Access Provision.

9

Nonetheless, Plaintiff implores the Court to consider the parties' intent.  See DE 68 at 5.  Plaintiff cites several cases for the proposition that the parties' intent governs the construction of a contract.  See id.  However, "[i]t is fundamental that parol evidence is inadmissible to vary or contradict the clear and unambiguous language of a contract." Uransky v. First Fed. Sav. & Loan Ass'n, 684 F.2d 750, 754 (11th Cir. 1982).  Here, the Access Provision in the Service Agreement is both unambiguous and reasonable. Because the Access Provision is unambiguous, the Court will not look to extrinsic evidence to interpret the Access Provision.

The Court will not re-write the parties' agreement.  Likewise, the Court  cannot find that Defendants breached the Service Agreement when the evidence indicates that they merely invoked their contractual rights.  Consequently, the Court will grant Defendants' motion for summary judgment as it pertains to Counts II and III of Plaintiff's Complaint.

## 2. Plaintiff's Claim of Tortious Interference (Count IV)

Plaintiff represents that it is "no longer pursuing its tortious interference claim." DE 68 at 8.  Thus, Plaintiff contends, Defendants' motion for summary judgment as to Count IV is moot.  Id.  Plaintiff, however, has not filed an amended complaint in this matter.  The Court will therefore rule on Defendants' motion for summary judgment on Plaintiff's claim for tortious interference.

Under Florida law, to prevail on a claim for tortious interference, a plaintiff must prove each of the following four elements: (1) the plaintiff has a business relationship; (2) the defendant has knowledge of plaintiff's business relationship; (3) the defendant intentionally and unjustifiedly interfered with the relationship; and (4) the plaintiff

10

suffered damages as a result.  <u>KMS Rest. Corp. v. Wendy's Int'l, Inc.</u>, 361 F.3d 1321

(11th Cir. 2004).  Defendants assert in their Motion for Summary Judgment on

Complaint that Plaintiff has failed to make out a prima facie case of tortious

interference.  <u>See</u> DE 61 at 11-13.  Specifically, Defendant contends that Plaintiff has

failed to assert that it was damaged by Defendants' alleged tortious interference.  <u>See</u>

<u>id.</u>  Indeed, Plaintiff represented in an answer to an interrogatory that it sought no

damages under Count IV of the Complaint.  <u>See</u> DE 55-8 at 76.  Plaintiff later confirmed

the answer to the interrogatory in a deposition.  <u>Id.</u> at 100-01.  Because Plaintiff has

represented that it seeks no damages for its tortious interference claim, and has offered

no evidence of damages in opposition to Defendants' Motion for Summary Judgment

on Complaint, the Court will grant Defendants' motion for summary judgment on

Count IV.

### 3. Plaintiff's Claim of Conversion (Count V)

In Count V of the Complaint, Plaintiff seeks damages, including punitive

damages, for Broadband's alleged conversion of Plaintiff's Servers.  Under Florida law,

"[c]onversion is an 'act of dominion wrongfully asserted over another's property

inconsistent with his ownership therein.'"  <u>United Techs. Corp. v. Mazer</u>, 556 F.3d 1260,

1270 (11th Cir. 2009) (quoting <u>Thomas v. Hertz Corp.</u>, 890 So. 2d 448, 449 (Fla. Dist.

Ct. App. 2004)).  "The tort [of conversion] 'may occur where a person wrongfully refuses

to relinquish property to which another has the right of possession,' and it 'may be

established despite evidence that the defendant took or retained property based upon

the mistaken belief that he had a right to possession, since malice is not an essential

element of the action.'"  <u>Id.</u> (quoting <u>Seymour v. Adams</u>, 638 So. 2d 1044, 1047 (Fla.

Dist. Ct. App. 1994)).

As explained at length above, Defendants did not "wrongfully" prevent Plaintiff from accessing the Servers.  To the contrary, Defendants merely required Plaintiff to adhere to the Access Provision.  Because Plaintiff points to no other "wrongful" act perpetrated by Defendants, Plaintiff cannot prevail on its conversion claim.  The Court, therefore, will grant Defendants' motion for summary judgment on Count V.

### C. Motion for Partial Summary Judgment on Counterclaim

As noted above, Count I of the Amended Counterclaim alleges that Plaintiff breached the APA.  Under Florida law, to prevail in a breach of contract action, a litigant must prove the following three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.  Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006).  Here, the parties do not dispute the validity of the APA.  Defendants, therefore, have satisfied the first element.

The parties vigorously dispute, however, whether Plaintiff breached the APA. Defendants contend that Plaintiff breached the APA in multiple ways.  Before the Court can determine whether Plaintiff breached the APA, the Court must determine the APA's terms.

Pursuant to the APA, "Hostway sold, assigned, conveyed, transferred and delivered to Broadband and Broadband purchased and acquired from Hostway all of Hostway's right, title and interest in and to certain assets more specifically defined in Section 1.1 of the APA."  DE 62 at 3.  Among other items, the Purchased Assets included "all co-location-related contracts, agreements and relationships (collectively, the "Colo Contracts") between Hostway and its co-location customers ("Colo

12

Customers") whose equipment was located at the Facility[.]" <u>Id.</u> at 4.[3]  Regarding the

Colo Customers, the APA provides as follows:

> 4.8 <u>Colo Customers</u>.  The Colo Customers identified in Schedule 1.1(a)(i) sets forth all of the Seller's collocation customers of the FTL Colo Facilities.  Each Colo Contract is, and after the Effective Date on identical terms will be, legal, valid, binding, enforceable and in full force and effect.  No event or condition has occurred or alleged to have occurred that constitutes or, with notice or the passage of time, or both, would constitute a default or a basis of force majeure or other claim of excusable delay, termination, nonperformance or accelerated or increased rights by the Seller or, to the Seller's knowledge, any other person under any Colo Contract.  No person with whom the Seller has entered into such a Colo Contract is in default thereunder or has failed to perform fully thereunder.

DE 61-1 at 37 ("Customers Provision").  Regarding other assets that Defendants

purchased from Plaintiff, the APA contains the following provision:

> 4.11 <u>Condition and Maintenance of the Purchased Assets</u>. All Equipment, Mechanical Systems and Security Systems are operational and suitable for the purpose or purposes for which they are being used by the Sellers.  Seller is not aware of any required repairs of the Equipment, Mechanical Systems or Security Systems that are reasonably necessary for the continued use of such Equipment, Mechanical systems or Security Systems that are material in cost or nature.

<u>Id.</u> at 38 ("Condition Provision").  Defendants maintain that Plaintiff made

misrepresentations in both the Customers Provision and the Condition Provision.

Defendants, therefore, attempt to invoke the indemnification provision in the APA.

Section 7.2(a) of the APA provides, in relevant part, as follows: "<u>Indemnification by</u>

<u>Seller</u>.  The Seller and Parent, jointly and severally, agree to indemnify, defend and

hold harmless Purchaser . . . from and against all direct and indirect losses . . . incurred

by Purchaser arising out of . . . (a) any inaccuracy in or breach of any representation or

---

[3]     Defendants made these representations in their Statement of Undisputed Facts.  <u>See</u> DE 62.  Plaintiff "admitted" these facts.  <u>See</u> DE 69 at 2.

warranty made by Seller in this Agreement."  Id. at 42 ("Indemnification Provision").
Plaintiff, however, submits that there are genuine issues of material fact as to whether
Plaintiff made any misrepresentations in the relevant provisions.

### 1. The Customers Provision

Defendants assert that Plaintiff breached the Customers Provision.  To support
their assertion, Defendants point to the portion of the Customers Provision that states,
"[e]ach Colo Contract is, and after the Effective Date on identical terms will be, legal,
valid, binding, enforceable and in full force and effect [and no Colo Customer] is in
default thereunder or has failed to perform fully thereunder."  DE 61-1 at 37.  Schedule
1.1(a)(i) attached to the APA lists thirteen customers.  Id. at 47.  Thus, pursuant to the
Customers Provision, Plaintiff represented in the APA that all thirteen of the customers'
contracts were legal, valid, binding, enforceable, and in full force and effect.  See id. at
37, 47.

Defendants, however, contend that Plaintiff's representation was false.
Specifically, Defendants submit that eight of the thirteen Colo Contracts were not in full
force and effect at the time the parties executed the APA.  DE 62 at 14; DE 54-1 at 2-3
("Affidavit of Soraya Moreno").  Furthermore, according to Defendant, other Colo
Customers were in default at the time the parties executed the APA.  DE 62 at 14-15;
see also DE 60-1 at 84-86 ("Deposition of Erin Washburn").

With respect to Defendants' contention that eight of the thirteen Colo Contracts
were not in effect despite Plaintiff's representation that they were, Plaintiff argues that it
could not have breached the APA because Defendants seek damages related to only
four of the thirteen customers.  See DE 70 at 6.  Plaintiff then asserts that "Broadband

14

was aware that [one of the Colo Customers] cancelled its co-location services prior to the signing of the APA."  Id.  Plaintiff, therefore, appears to concede that not all of the Colo Contracts were in effect when the parties executed the APA.  Likewise, Plaintiff asserts that "[n]ot only did Hostway inform Broadband pre-closing that [one of the Colo Customers] was not current in its payments and was unable to pay Hostway the full amount it owed, the parties reduced the purchase price of the APA to reflect [that Colo Customer's] financial situation."  Id. at 7.  Thus, Plaintiff appears to concede that not all of the Colo Customers were in good standing when the parties executed the APA.

Essentially, Plaintiff asks the Court to look to extrinsic evidence of the parties' intent regarding the APA (i.e., Plaintiff asks the Court to disregard the plain language in the contract because the parties did not really intend for the representations in the contract to stand).  As discussed at length above, however, the Court cannot look to extrinsic evidence to interpret a contract when the contract is unambiguous on its face.  Here, the Customer Provision of the APA is unambiguous.  The Court, therefore, rejects Plaintiff's argument.[4]

---

[4]   Moreover, Article IV of the APA states as follows:

> In order to induce Purchaser to enter into this Agreement and to consummate the transactions contemplated under this Agreement, the Seller and Parent, jointly and severally, hereby make the following representations and warranties, and acknowledges and agrees that Purchaser may rely on, and each of which is relied upon by Purchaser, regardless of any other action, omission to act, investigation made or information obtained by Purchaser: [the Customer Provision].

DE 61-1 at 35.  Thus, even if Defendants knew that the APA contained misrepresentations, the plain language of the APA gives Defendants the right to rely on those representations anyway.

Alternatively, Plaintiff argues that even if it breached the APA, the breach was not material.[5]  See DE 70 at 7 (citing Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So. 2d 853, 857 (Fla. 1972) ("To constitute a vital or material breach a [party's] nonperformance must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part.").  According to the Plaintiff, the APA "was a sale of equipment, and the parties attached nominal value to the revenue from the Colo Customers."  DE 70 at 7.  To support its argument, Plaintiff refers to the deposition testimony of Plaintiff's CEO, Lucas Roh.  At his deposition, Mr. Roh testified that "we gave away the customers because the actual physical assets of the data center . . . constitute far more than $650,000 in terms of the worth of those assets."  DE 57-1 at 78.

Mr. Roh's deposition testimony is self-serving.  Nonetheless, "for purposes of summary judgment, 'self-serving testimony,' . . . may not be disregarded by the district court in determining whether there is a genuine dispute of fact on a material issue in the case."  Newsome v. Chatham Cnty. Det. Ctr., 256 Fed. App'x 342, 346 (11th Cir. 2007).  Indeed, "'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'"  Id.  (quoting Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005)).  Plaintiff, therefore, has created a disputed issue

---

[5]    Plaintiff submits in its opposition to Defendants' Motion for Partial Summary Judgment on Counterclaim that "even if a valid contract existed and the customer was not in default to Hostway at the time of closing, Broadband could expect at best a month of continued revenue from any Colo Customer [and] the monthly amounts paid to Hostway by Arcadia, Visual and Alive were only $661.90, $848.00 and $1224.00, respectively."  DE 70 at 7.  Plaintiff's argument all but concedes that Defendants suffered at least some damages based on the misrepresentations in the APA.

of fact regarding the materiality of the breach.

Defendants argue that the breach need not be material.  See DE 74 at 2-3. According to Defendants, the issue of materiality relates only to whether Plaintiff's breach was so significant that it would have allowed Defendant to rescind the APA. See id.  In other words, according to Defendants, a party can breach a contract without the breach rising to the level of a material breach.  Defendants point out that "nominal damages . . . are recoverable upon a finding of breach of contract even though no proof of further damages is made out."  Zim v. Western Publishing Co., 573 F.2d 1318, 1326 (5th Cir. 1978) (applying Florida law); Zayre Corp. v. Creech, 497 So. 2d 706, 708 (Fla. Dist. Ct. App. 1986); Young v. Johnston, 475 So. 2d 1309, 1313 (Fla. Dist. Ct. App. 1985).  The Court is inclined to agree.

Nonetheless, many Florida courts have included "material breach" as one of the elements of a breach of contract claim.  See, e.g., Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000).  Notably, in Abbott Labs., the Florida district court injected the materiality requirement without explanation.  See id. Moreover, the cases cited by Abbott Labs. do not list "material breach" as an element of a breach of contract action.  See id. (citing Mettler, Inc. v. Ellen Tracy, Inc., 648 So. 2d 253, 255 (Fla. Dist. Ct. App. 1994); Abruzzo v. Haller, 603 So. 2d 1338 (Fla. Dist. Ct. App. 1992)).  Furthermore, many of the Florida courts that have listed "material breach" as one of the elements in a breach of contract action can be traced back to Abbott Laboratories.  See, e.g., J.J. Gumberg Co. v. Janis Servs., Inc., 847 So. 2d 1048, 1049 (Fla. Dist. Ct. App. 2003); see also Friedman v. N.Y. Life Ins. Co., 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008) (citing J.J. Grumberg); Merin Hunter Codman, Inc. v.

17

Wackenhut Corrs. Corp., 941 So. 2d 396, 398 (Fla. Dist. Ct. App. 2006) (citing J.J. Grumberg).

Many federal courts applying Florida law have also included "material breach" as one of the elements of a breach of contract action.  See, e.g., Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009) (citing Friedman, 985 So. 2d at 58).  Federal courts often cite Abruzzo when setting forth the materiality requirement for a breach of contract action under Florida law.  See, e.g., Beck v. Lazard Freres & Co, LLC, 175 F.3d 913, 914 (11th Cir. 1999); see also Trowell v. S. Fin. Group, Inc., 315 Fed. App'x 163, 165 (11th Cir. 2008) (citing Beck).  Abruzzo, however, does not mention materiality as an element of a breach of contract action.

Because the materiality requirement appears to be the result of spontaneous generation, the Court is reluctant to require an aggrieved party to prove a "material breach" to establish a breach of contract under Florida law.  Indeed, this Court has found no case where the Supreme Court of Florida has held that a party must prove a material breach to prevail in a breach of contract action.  Also, "[t]he award of damages is the common form of relief for breach of contract.  Virtually any breach gives the injured party a claim for damages."  United States v. Winstar Corp., 518 U.S. 839, 886 n. 30 (1996) (quoting 3 E. Farnsworth, Contracts § 12.8 (1990).  Nonetheless, the Eleventh Circuit has listed "material breach" as an element of a breach of contract action under Florida law on multiple occasions.  See, e.g., Vega, 564 F.3d at 1272; Beck, 175 F.3d at 914.  Accordingly, the Court follows Eleventh Circuit precedent.

Because Plaintiff has demonstrated a material issue of fact regarding the materiality of the breach of the APA, the Court must deny Defendants' Motion for

Summary Judgment on Counterclaim insofar as it pertains to the Customers Provision.

## 2. The Condition Provision

Defendants contend that Plaintiff "delivered the Equipment and Mechanical Systems to Broadband with material deficiencies." DE 62 at 16; see also DE 53-1 ("Calderon Affidavit").[6] Specifically, Defendants submitted evidence that "Hostway's failure to deliver the Facility with all systems operational and suitable for the purposes of which they are intended required [Defendants] to expend the total sum of $32,782.91 to date." Calderon Affidavit at 8. Defendants also offered evidence that they "will incur

---

[6]   To support their argument, Defendants offer the affidavit of Daniel Calderon. See DE 53-1. Mr. Calderon is Defendant's Certified Data Center Professional. Id. Mr. Calderon averred that "[u]pon acquisition of the Facility, as part of my job duties, I immediately undertook a thorough investigation of all physical and mechanical systems within the Facility." Id. at 2. Mr. Calderon further averred that his "initial inspection in May of 2009 revealed that not all of the Equipment, Mechanical Systems and Security Systems were operational and suitable for the purpose or purposes for which they were being used at the time of Host's acquisition of the Facility." Id. at 3. Mr. Calderon averred that he used a third-party, Power Pro-Tech Services, Inc. to inspect the generator at the Facility. Id. The inspection revealed that "the generator required fuel tank piping repairs and cleaning due to excessive dirt and rodent infestation." Id. Similarly, Defendants engaged Safe Fire Protection, Inc. to inspect the Facility's fire suppression system. Id. The inspection revealed that the HVAC units were not tied to the fire suppression system as required by code, that Hostway had failed to complete the installation of safety bypass switches for the fire suppression system, and that the system was incorrectly zoned. See id. at 5-6. Furthermore, the inspection revealed that four of the batteries in the Facility's uninterruptible power supply system ("UPS") were dead. Id. at 6. When Defendants contracted Emerson Network Power to replace the dead batteries, Emerson inspected the UPS system and determined that the system's DC and AC Caps were at the end of their useful life. Id. Emerson further determined that it would cost $23,000.00 to replace the caps. See id. Additionally, Defendants engaged American HVAC-R Services, Inc. to inspect the Facility's HVAC system. Id. at 7. The inspection revealed a leak in one of the air conditioner's main 6" copper lines and showed that nine out of ten of the Facility's CRAC units were piped backwards." Id. Defendants attached invoices to the Calderon Affidavit that reflect the cost of the work actually performed on equipment at the Facility as well as estimates of work to be performed in the future. See id.

an additional $25,500.00 to remedy the deficiencies in the Facility occasioned by Hostway's failure to deliver the Facility's mechanical and safety systems in good working order." Id. Thus, Defendants have submitted evidence that they must spend in excess of $57,000 to repair equipment in the Facility. See id.

$57,000 is not an insignificant sum. Furthermore, the total purchase price in the APA is $528,333.34. DE 61-1 at 33. Defendants' evidence therefore indicates that the cost of repairing the equipment in the facility exceeds ten percent of the purchase price. Plaintiff represented in the APA that it was "not aware of any required repairs of the Equipment . . . that are material in cost or nature." Id. at 38. The Court finds that repairs exceeding ten percent of the purchase price are material in cost and nature.

Plaintiff, however, disputes Defendants' contention that the equipment in the Facility needed repairs. According to Plaintiff, "[c]ontrary to Broadband's assertions, all equipment and mechanical systems were operational and suitable for the purposes for which Hostway was using them at the time of closing." DE 70 at 10. To make its case, Plaintiff relies heavily on the deposition testimony of Rafael Orellanes. See DE 69 at 7-10. Mr. Orellanes was Plaintiff's Data Center Facilities Technician. DE 56-1 at 6. Although portions of Mr. Orellanes' testimony support Plaintiff's position, Mr. Orellanes also testified that the fire suppression system at the Facility was not "up-to-code" and that sensors in the fire suppression system needed to be replaced. Id. at 100-04. Similarly, Mr. Orellanes testified that the air conditioning units on the roof needed to be repaired. Id. at 112. He also testified that four months before the parties executed the APA, he sought authority to perform maintenance on the generator, but the authority was never given. Id. at 29-30. Moreover, Mr. Orellanes testified that Plaintiff asked him

20

to "put off" performing maintenance in the Facility.  See id. at 22-23.

Because Plaintiff's own witness testified that equipment at the Facility required repairs, and Plaintiff offered no evidence to rebut Defendants' evidence that Defendant expended $32,782.91 to repair equipment at the Facility, there is no disputed issue of fact regarding whether Plaintiff was "aware of any required repairs of the Equipment, Mechanical Systems or Security Systems that are reasonably necessary for the continued use of such Equipment, Mechanical systems or Security Systems that are material in cost or nature."  DE 61-1 at 38.[7]  The Court therefore finds that Defendants are entitled to partial summary judgment on their claim that Plaintiff breached the APA. Because Defendants seek partial summary judgment only as to Plaintiff's liability for breach of the APA, but not to the amount of damages, the Court leaves the issue of damages for trial.

## III. CONCLUSION

In light of the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants'/Counter Plaintiffs' Motion for Partial Summary Judgment on Complaint [DE 61] is **GRANTED**;

2. Counts II, III, IV, and V of Plaintiff's Complaint are **DISMISSED WITH PREJUDICE**;

3. Defendants'/Counter Plaintiffs' Motion for Partial Summary Judgment on

---

[7]   In addition to the testimony of Mr. Orellanes, Plaintiff relies on the affidavit of Arnold Choi to create a disputed issue of fact regarding the breach of the Condition Provision.  Mr. Choi, however, testified that Plaintiff never investigated the equipment's condition prior to the closing of the APA and that he never discussed the condition of the equipment with Mr. Orellanes.  See DE 55-1 at 31, 90-91.

Counterclaim [DE 62] is **GRANTED**;

4.      Although a disputed issue of fact exists regarding whether Plaintiff breached the Customer Provision, no disputed issue of fact exists regarding whether Plaintiff breached the Condition Provision, and summary judgment as to liability only is therefore entered in favor of Defendants/Counter Plaintiffs and against Plaintiff/Counter Defendant on Count I of Defendants' Amended Counterclaim.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 13th day of September, 2010.


JAMES I. COHN
United States District Judge


Copies provided to counsel of record.